# In the United States Court of Federal Claims

No. 11-687C
Filed: January 31, 2012[1]
**TO BE PUBLISHED**

*********************************************
                                            *
VIRGIN ISLANDS PAVING, INC.,                *
                                            *
          Plaintiff,                        *
                                            *
                                            *   Post-Award Bid Protest, 28 U.S.C. §
v.                                          *     1491(b)(1);
                                            *   Supplementation of the Administrative
                                            *     Record.
THE UNITED STATES,                          *
                                            *
          Defendant.                        *
                                            *
*********************************************

**Michael A. Gordon and Fran Baskin,** Michael A. Gordon PLLC, Washington, D.C., Counsel for Plaintiff.

**Austin Fulk,** United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**Milton Hsieh,** Federal Highway Administration, Sterling, Virginia, Of Counsel, for Defendant.

### MEMORANDUM OPINION AND FINAL ORDER

**BRADEN, *Judge*.**

---

[1] On January 26, 2012, the court forwarded a sealed copy of this Memorandum Opinion and Final Order to the parties to redact any information considered to be confidential and/or privileged, and note any editorial errors requiring correction. The court has incorporated the proposed redactions that the court deemed confidential or for which one of the parties provided a sufficient basis to warrant confidential treatment. Therefore, portions of this Memorandum Opinion and Final Order are redacted, as indicated by the notation "[redacted]." This redacted version and a non-redacted version have been filed on this date with the Clerk of the United States Court of Federal Claims.

I.      **RELEVANT FACTS.**[2]

    A.      **On July 7, 2004, The Federal Highway Administration Entered Into A Memorandum Of Understanding With The Virgin Islands Government To Construct Certain Highway Projects.**

        On July 7, 2004, the Federal Highway Administration ("FHWA") and the Virgin Islands Department of Public Works ("VIDPW") entered into a Memorandum of Agreement ("MOA"). AR 1-2.  Pursuant to the MOA, the FHWA agreed to provide funding and handle procurement for certain highway construction projects in the Virgin Islands.  AR 1-2.  The MOA provided that the procurement would be conducted in accordance with the Federal Acquisition Regulation ("FAR") and other relevant federal regulations.  AR 2 ¶ 5.  The MOA also required the FHWA to "request written comments and/or concurrence" of the VIDPW with respect to "Contract award[s]."  AR 3 ¶ 9.

    B.      **On July 25, 2011, The Federal Highway Administration Issued An Invitation For Bids For Construction On The Frenchman Bay Road.**

        On July 6, 2011, the FHWA posted Solicitation No. DTFH71-11-B-00019 on the Federal Business Opportunities website.  AR 774.  A formal Invitation for Bids ("IFB"), issued on July 25, 2011, for construction services to "[w]iden and reconstruct Frenchman Bay Road with asphalt pavement, utilities, drainage, signal system, street lighting, and other miscellaneous work."  AR 11, 774.  The IFB requested a sealed bid that was to be evaluated, pursuant to FAR 52.214-19.[3]  AR 47.  The IFB provided that "[t]he contract will be awarded to the responsive, responsible bidder with the lowest Evaluation Total Price of Project . . . ."  AR 33.

---

[2] The relevant facts in this case are derived from the Administrative Record (AR 1-821), submitted under seal by the Government on November 1, 2011.  On November 21, 2011, Plaintiff filed a Motion For Judgment On The Administrative Record.  The court has determined that the proffered documents are not necessary "to permit meaningful judicial review."  *Axiom Res. Mgmt.* v. *United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009).  Accordingly, Plaintiff's November 21, 2011 Motion To Supplement is denied.

[3] FAR 52.214-19 provides:

(a) The Government will evaluate bids in response to this solicitation without discussions and will award a contract to the responsible bidder whose bid, conforming to the solicitation, will be most advantageous to the Government, considering only price and the price-related factors specified elsewhere in the solicitation.

(b) The Government may reject any or all bids, and waive informalities or minor irregularities in bids received.

(c)  The Government may accept any item or combination of items, unless doing so is precluded by a restrictive limitation in the solicitation or the bid.

Before issuing the July 25, 2011 IFB, a FHWA engineer prepared an estimate (the "Engineer's Estimate") of the project, concluding that it would likely cost $8,550,000, plus administrative costs, for a total of $9,994,500.[4]   AR 491-92, AR 493-505 (itemized estimate for each line item).   At least some of this Engineer's Estimate was based on prices submitted by the Island Roads Corporation ("IRC") in a prior procurement.   *Compare* AR 511 (noting that the "[Engineer's Estimate] unit price was based on the bid history from the previous VI A30 (035) C3 project"), *with* http://www.efl.fhwa.dot.gov/files/contracting/bidtabs/CT_VI-0A30(035)_C-3.pdf (cited at Pl. Br. at 3 n.1) (noting that IRC was the low bidder for Contract No. VI A30 (035) C3).   The IFB, however, indicated that the Frenchman Bay Road construction project would likely cost between $5 and $10 million.   AR 31.

### C.     In August 2011, Virgin Islands Paving And Island Roads Corporation Submitted Bids That Were Lower Than The Federal Highway Administration's Engineer's Estimate.

Two bidders submitted bids: Virgin Islands Paving, Inc. ("VIP"), and IRC.   AR 492, 775. On August 24, 2011, VIP submitted a bid for $6,762,720, *i.e.*, 20.9% lower than the Engineer's Estimate.   AR 312-78, 492.   VIP certified that it was a Small Business Concern in its August 24, 2011 bid.[5]   AR 363.   On August 26, 2011, IRC submitted a bid for $7,917,130, *i.e.*, 7.4% lower than the Engineer's Estimate and 14.6% more than VIP.   AR 373-429, 492.

---

(d) The Government may reject a bid as nonresponsive if the prices bid are materially unbalanced between line items or subline items.   A bid is materially unbalanced when it is based on prices significantly less than cost for some work and prices which are significantly overstated in relation to cost for other work, and if there is a reasonable doubt that the bid will result in the lowest overall cost to the Government even though it may be the low evaluated bid, or if it is so unbalanced as to be tantamount to allowing an advance payment.

48 C.F.R. § 52.214-19.

[4] Based on the bids, the FHWA calculated a total evaluated price for each contract that included the price of the bid plus additional FHWA costs of $2,700 per day to administer the contract.   AR 491.

[5] The Government states that "it is unclear whether VIP is in fact a small business" because in its Online Representations and Certifications Application ("ORCA") VIP states that it is not a small business.   Government's Cross Motion For Judgment On The Administrative Record at 11 n.4 (citing AR 467).   ORCA certifications "may be supplemented by information submitted to the Government in response to a specific solicitation" (AR 448), as occurred here. For this reason, presumably, the FHWA during the procurement appears to have assumed that VIP was a small business.   *See* AR 547 (internal FHWA email discussing VIP as a small business).

The total evaluated price for the VIP bid was $8,193,732 (18% less than the Engineer's Estimate); for IRC it was $9,199,630 (7.9% less than the Engineer's Estimate). AR 491. The FHWA, however, relied on the as-bid costs in assessing VIP's Proposal. *See, e.g.*, AR 771.

      **D.**    **The Federal Highway Administration's Initial Evaluation Decision To Award The Contract To Plaintiff.**

Although VIP was the lower bidder, the FHWA and VIDPW officials had two concerns about VIP's bid.

First, on August 29, 2011, the Contract Specialist for the FHWA received "some past performance [reports] that [were] not very good" regarding VIP's previous work for VIDPW. AR 508. These reports rated VIP's past performance as "[redacted]" or "[redacted]" in certain areas. AR 557. These reviews, however, did not all explain the reasons for the negative ratings. AR 557. Accordingly, the FHWA contacted VIDPW, requesting completed evaluation forms. AR 557. In contrast to these negative evaluations, "[s]everal of the past performance [reports] . . . received gave the contractor [ratings of] [redacted]" and "[s]everal people indicated that they were satisfied with [VIP's] performance, cooperativeness, and quality of work . . . ." AR 561.

Second, the FHWA and VIDPW were concerned that VIP's low bid reflected a poor understanding of the project. AR 489, 548, 556. Accordingly, on August 29, 2011, the FHWA initiated a review of both VIP's and IRC's bids in light of their variance from the "Engineer's Estimate." AR 489, 548. The primary focus was twelve line items where the bid price was "significantly higher or lower than the Engineer's Estimate unit price." AR 489.[6] On September 5, 2011, a team of FHWA analysts determined:

> It's true that [VIP] bid very low on certain pay items; however, [IRC] also bid pretty low, if not quite as low, on almost all of those same items. In comparing the two bidders, it can be seen that 4 of the top 5 items that accounted for the majority of the overall price difference between the Contractor bid totals and the [Engineer's Estimate] total were the same. Therefore, it appears that both [VIP] and [IRC] were in substantial agreement that the [Engineer's Estimate] unit prices were too high, and that *any attempt to reject [VIP's] bid will need to be based on something else, for instance past performance.*

AR 538 (emphasis added); *see also* Court Exhibit A.

Therefore, the FHWA team recommended accepting both contractors' bids for all twelve line items. AR 540-43; *see also* AR 551 (Sept. 8, 2011 email exchange between the FHWA analysts and Contract Specialist concluding that "[t]he bid prices evaluated as part of the analysis found nothing that would raise a concern. Typically, other unit prices bid which were not consistent with [the Engineer's Estimate] unit prices were tightly grouped, providing validation of the bids.")

---

[6] Court Exhibit A, attached to this Memorandum Opinion, compares the twelve line items for VIP's and IRC's bids.

On September 12, 2011, the Contract Specialist advised VIDPW via email that "[o]ur people have no problem with awarding to either firms [sic] at the related pricing given."  AR 554.  VIDPW responded: "[The] Commissioner right now is not prepared to sign any contract awards to [VIP]."  AR 553.

On or around September 14, 2011, FHWA asked VIP to verify its bid and, in particular, the "Irrigation" line item.  AR 772-73.  On the same day, the Contract Specialist sent VIDPW a concurrence letter to be signed by the VIDPW Commissioner, together with a September 13, 2011 Memorandum, signed by the Contracting Officer ("CO") and the FHWA's Legal Counsel, recommending the contract be awarded to VIP.  AR 555, 560-62.  The September 13, 2011 Memorandum concluded that VIP's two [redacted] past performance ratings were "not enough poor [past performance] to outweigh the good [past performance] received. . . . Based on the available information, and in accordance with FAR 9.104-1, [VIP] is considered responsible and qualified to perform the contract."  AR 561.  The September 13, 2011 Memorandum also concluded that "[t]he bid prices evaluated as part of the analysis found nothing that would raise a concern.  Typically, other unit prices bid which were not consistent with [the Engineer's Estimate] unit prices were tightly grouped, providing validation of the bids. . . .  Based upon the comparison of the competitive prices received for this project and the Engineers [sic] Estimate, *there is no indication that the bid contains any mistakes*."  AR 561-62 (emphasis added).

On the morning of September 19, 2011, a member of the VIDPW Commissioner's staff advised the FHWA that the VIDPW still was "concerned" that VIP "ha[d] not been performing on other VI DPW projects" and was "getting political pressure" not to concur in the award.  AR 619.  Nevertheless, on September 19, 2011, the VIDPW Commissioner concurred in the award to VIP.  AR 625-27.

### E.   On September 20, 2011, The Federal Highway Administration Reversed Course After Encountering Resistance From The Virgin Islands Department Of Public Works.

An hour *after* concurring in the award to VIP, the VIDPW Commissioner and his staff requested a conference call with FHWA during which they continued to express concerns about VIP.  AR 628.

Later in the day on September 19, 2011, the VIDPW provided the FHWA with completed versions of VIP's [redacted] performance evaluations.  AR 629-41, 645.  These reports included narrative descriptions of VIP's [redacted] performance at the following locations: five interim performance evaluations of VIP's performance on a construction project at [redacted] (AR 630-39), and an interim performance evaluation on the [redacted] (AR 640-41).  The [redacted] evaluations contain some internal contradictions, but all conclude that VIP's overall performance on the project was "[redacted]."  AR 630-39.  Of the thirty-three factors listed on the evaluation form, the [redacted] evaluations gave VIP between zero to twelve "[redacted]" rankings.  AR 630-39.  The comments on the [redacted] evaluations indicate that VIP [redacted] (AR 633, 637), [redacted] (AR 635), [redacted] (AR 633, 635, 639), and [redacted] (AR 639).

The [redacted] evaluation gave VIP an overall rating of "[redacted]," but did not rank its performance as "[redacted]" on any individual factors.  AR 641.  The [redacted] comments indicated that VIP [redacted].  AR 641.

On the morning of September 20, 2011, the CO and other FHWA decision-makers convened a meeting with the VIDPW Commissioner to assure him that VIP would complete the work.  AR 645.  According to the CO's account of the September 20, 2011 meeting:

> [FHWA Legal Counsel] Milton [Hsieh] . . . suggested a way [FHWA] could award to other offer [sic] besides using responsibility/performance.  In 14.407-3(5) [sic[7]] allows the CO to go to another offeror if it is shown based upon the contractor's backup info that there was an obvious mistake in bid.  We are working . . . to get a bid item list together to send to the contractor requesting verification, if he still verifies I will need something from [the Highway Design division] stating that based on actual ([IRC's] actual to show the costs for some of the critical items. [sic]  Don't know if it will work, but we are working on it.

AR 645.

On September 20, 2011, Jameel Siddiqi, an FHWA employee who does not appear to have been involved in FHWA's September 5, 2011 analysis, but who appears to have been present at the September 20, 2011 meeting (AR 628, 645), prepared a new bid analysis AR 734-39).  This analysis reviewed twenty-four different line item bids.  For each line item, this analysis identified VIP's and IRC's respective bids for the line item, the Engineer's Estimate for the line item, and a brief statement about any differences.  AR 734-39.  In a number of instances, Mr. Siddiqi concluded that the Engineer's Estimate should be recalculated and/or that the total quantities solicited in the IFB were in error.  AR 734-39.  With respect to a number of line items, Mr. Siddiqi concluded that both IRC and VIP submitted similarly low bids or that IRC's bid substantially was lower than VIP's bid.  *See, e.g.*, AR 734 (Item 15101-0000 "Mobilization"); AR 735 (Item 20103-0000 "Cleaning and Grubbing"); AR 736 (Item 20401-0000 "Roadway Excavation"); AR 737 (Item 60102-0000 "Concrete reinforced switch pad"); AR 738 (Item 60902-1000 "Curb and Gutter").

---

[7] The CO appears to have intended to reference FAR 14.407-3(g)(5).

**F.      On September 20, 2011, The Federal Highway Administration Again Requested Plaintiff To Verify Its Bid.**

Later the same day, the FHWA sent VIP a letter expressing concerns about twelve different items on VIP's bid.[8]   AR 779.   In response, VIP was requested to provide "documentation on how [it] developed [its] prices" for each of the line items by noon on September 22, 2011.  AR 779.

**G.      On September 21, 2011, Plaintiff Confirmed Its Bid.**

On September 21, 2011, VIP responded to the FHWA's September 20, 2011 letter stating that VIP was "pleased with [its] prices" and provided brief explanations for how each of the twelve line items in question had been priced.  AR 786-87.[9]  With respect to six of the line items, VIP indicated that the bid price reflected a markup of Disadvantaged Business Enterprise ("DBE") subcontractors' bids.   AR 787.   VIP did not provide any further supporting documentation, such as spreadsheets or original calculations, showing how any of the bid items had been developed.  AR 786-87.

**H.      On September 22, 2011, The Federal Highway Administration Awarded The Contract To Island Roads Corporation.**

On September 22, 2011, the FHWA reviewed VIP's September 21, 2011 letter and issued a Memorandum advising the CO that:

> While [VIP's] letter addresses all the pay items in question, the information submitted only marginally supports those prices and no documentation to further substantiate support [sic] those prices has been submitted to help understand the reasoning for the low prices.   We remain extremely concerned over prices submitted for contract pay items that will be constructed by their DBE Contractor. If underbid, these pay items could result in a substantial financial burden to the prime Contractor and reasoning [sic] for poor execution of the contract.

---

[8] Four of the twelve items are the same as the twelve items that the FHWA initially examined on September 5, 2011.  *Compare* AR 779-80 (Sept. 20, 2011 letter), *with* AR 540-43 (Sept. 5, 2011 analysis); *see also* Court Exhibit A.   The difference between the twelve items identified in the September 20, 2011 letter and the September 5, 2011 analysis is not explained or recognized anywhere in the Administrative Record.  Four of the items in the September 5, 2011 analysis were those that VIP *over*bid; thus, their absence from the September 20, 2011 letter may be explained.  Court Exhibit A.  The court, however, does not understand why the four remaining items that VIP substantially underbid and included in the September 5, 2011 analysis were not discussed in the September 20, 2011 letter.  Nor does the court understand why the FHWA identified eight *new* line items that VIP underbid in the September 20, 2011 letter, when these items apparently did not concern the agency on September 5, 2011.

[9] Court Exhibit A summarizes VIP's explanation for each of the items.

AR 703.

In addition, the September 22, 2011 Memorandum noted:

In our original analysis of the bid, pay item 63503-0700 Temporary Traffic Control, Pavement Marking was substantially overbid, more than ten times our Engineer's Estimate and more than eight times the second low bidder. Our bid analysis showed that the quantity was in error, approximately 20% low. This bid may indicate either an error in the bid, or that the Contractor may be trying to take advantage of the bid error by the extremely high price.

AR 703.[10]

Therefore, the September 22, 2011 Memorandum concludes:

Based on the Government's concerns and information provided by [VIP] the CO was not able to determine fair and reasonable pricing to the contractor and the Government. Therefore, in accordance with FAR 14.407-3(g)(5) the CO can reasonably justify the conclusion that acceptance of the bid would be unfair to [VIP]. The CO has made her decision to award this contract to the second low bidder, [IRC].

AR 704.[11]

The September 22, 2011 Memorandum also concludes that VIP has "adequate experience to perform the contract work," but goes on to discuss the poor past performance reviews VIDPW provided to the FHWA. AR 704. It does not mention the positive performance reports FHWA received regarding VIP. *Compare* AR 561 (Sept. 13, 2011 Memorandum discussing positive performance), *with* AR 704 (Sept. 22, 2011 Memorandum).

On the same day, the CO received the VIDPW Commissioner's concurrence to award the Contract to IRC. AR 667, 688-92. Later that day, FHWA advised VIP that, because its September 21, 2011 "response did not provide the requested documentation to show how your firm's prices were developed," the Contract had been awarded to IRC. AR 718.

---

[10] The September 22, 2011 Memorandum's analysis of VIP's September 21, 2011 letter was copied, verbatim, from an email drafted by a FHWA employee earlier on the morning of September 22, 2011. *Compare* AR 667, *with* AR 703.

[11] The CO and FHWA's Legal Counsel reviewed FHWA's new Memorandum justifying the award. AR 701-04.

### I.        On September 27, 2011, Plaintiff Filed An Agency-Level Bid Protest.

On September 27, 2011, VIP filed an agency-level bid protest, arguing that the September 22, 2011 award to IRC violated the sealed bid requirements of FAR 52.214-19, incorporated into the July 25, 2011 IFB.  AR 715-17.

On October 7, 2011, FHWA's Planning & Programs Manager, the official in charge of reviewing the CO's decision, concluded that the July 25, 2011 IFB contained several errors and that,

> [S]ignificant quantity revisions [to the IFB] are required.  If the contractors computed quantities the same way I did, their unit prices could be skewed all over the place to try and make it more beneficial to them.

AR 733.

This FHWA official suggested that the contract should be re-competed.  AR 733.  On October 12, 2011, the FHWA's Highway Division concluded, after adjusting for the errors in the July 25, 2011 IFB identified on October 7, 2011, that IRC's bid should be reduced by $610,000.  AR 756.  The same day, FHWA officials decided that instead of focusing on discrepancies between VIP's bids for individual line items, "we will deny the protest simply based on the bid being *overall* unreasonably low."  AR 760 (emphasis added).

Accordingly, on October 13, 2011, the FHWA denied VIP's September 27, 2011 agency-level bid protest, concluding that the FHWA had properly rejected VIP's bid, pursuant to FAR 52.214-19(b) and FAR 14.407-3(g)(5), because "the *overall* price submitted by [VIP]" was out of line with other bids and the Engineer's Estimate.  AR 771 (emphasis added).

## II.    PROCEDURAL HISTORY.

On October 17, 2011, VIP filed a Complaint in the United States Court of Federal Claims seeking a Temporary Restraining Order, Preliminary and Permanent Injunctive Relief, and Declaratory Judgment ("Compl.").  The Complaint alleges that the FHWA's invocation of FAR 14.407-3(g)(5) was "misplaced" and that the agency was required to accept VIP's bid because it was the lowest priced responsive bid.  Compl. ¶¶ 21-20.2.[12]

On October 18, 2011, the court convened a status conference to discuss scheduling and Plaintiff's request for a Temporary Restraining Order and Preliminary Injunction.  During the status conference, the Government represented that it was willing to stay performance of the Contract until at least December 31, 2011.  Accordingly, on October 20, 2011, the court denied Plaintiff's request for a TRO and Preliminary Injunction as moot.

---

[12]  Due to a (presumably) typographical error, the paragraphs in pages 5-6 of VIP's Complaint are numbered in the following order 20, 21, 20, 21, 22, 23, 24.  For clarity, the court will refer to the second paragraphs 20 and 21 as paragraphs 20.2 and 21.2, respectively.

On November 1, 2011, the Government filed a Consent Motion For Protective Order that the court granted the same day. On November 1, 2011, the Government also filed the Administrative Record under seal.

On November 21, 2011, the parties filed Cross-Motions For Judgment On The Administrative Record ("Pl. Br.," "Gov't Br."). On December 12, 2011, the parties filed Responses ("Pl. Resp.," "Gov't Resp.").

On December 29, 2011, the Government filed a Notice Of Suspension Of Performance, until at least January 31, 2012.

## III.   DISCUSSION.

### A.   Jurisdiction.

The October 17, 2011 post-award bid protest Complaint in this case alleges that the July 25, 2011 award to IRC violated FAR 14.408-1 because VIP was the lowest responsive, responsible, bidder and FHWA unreasonably decided to reject VIP's bid. Compl. ¶¶ 21-20.1.

Pursuant to 28 U.S.C. § 1491(b)(1) (2006), the United States Court of Federal Claims has jurisdiction:

> [T]o render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

*Id.*

Accordingly, 28 U.S.C. § 1491(b)(1) authorizes the court to adjudicate the claims alleged in the October 17, 2011 Complaint.

### B.   Standing.

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1). *See Myers Investigative & Sec. Servs., Inc.* v. *United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue."). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" to be synonymous with the definition of "interested party" provided in the Competition in Contracting Act ("CICA"), Pub. L. No. 98-369, Div. B, Title VII (1984) (codified in relevant part, as amended, at 31 U.S.C. § 3551(2)(A)). *See Rex Serv. Corp.* v. *United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (collecting decisions adopting the CICA definition of "interested party" to convey standing under 28 U.S.C. § 1491(b)(1)). A two-part test is applied to determine whether a protester is an "interested party." A protestor must establish that: "(1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement." *Distributed Solutions, Inc.* v. *United States,* 539 F.3d 1340, 1344 (Fed. Cir. 2008).

A protestor also must show that the alleged errors in the procurement were prejudicial. *See Labatt Food Serv., Inc.* v. *United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." (internal quotation marks omitted)); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). A party demonstrates prejudice when "it can show that but for the error, it would have had a substantial chance of securing the contract." *Labatt,* 577 F.3d at 1378. Importantly, a proper standing inquiry must not conflate the requirements of "direct economic interest" and prejudicial error. *Id.* at 1380 (explaining that examining economic interest but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful").

The October 17, 2011 Complaint alleged sufficient facts to establish that VIP is an "interested party," *i.e.*, an offeror with a direct economic interest in the July 25, 2011 IFB. Compl. ¶ 13. As to prejudice, the Complaint alleges that VIP submitted the lowest bid and was one of two bidders that responded to the IFB. As such, there was a substantial chance that VIP would have been awarded that contract, but for the alleged errors in the procurement process. Compl. ¶ 13.

For these reasons, the court has determined that VIP has standing to pursue this bid protest in the United States Court of Federal Claims.

## C.   Standard Of Review.

Pursuant to the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874 (1996), the United States Court of Federal Claims is required to review challenges to an agency decision, pursuant to the standards set forth in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) (2006) (requiring the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *Banknote Corp. of Am.* v. *United States,* 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) . . . ."). The United States Court of Appeals for the Federal Circuit has provided the trial courts with specific guidance in how to analyze the criteria for injunctive relief under each of these three APA standards.

First, the United States Court of Appeals for the Federal Circuit has held that a bid award may be set aside if "the procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc.* v. *United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (internal quotation marks omitted). The United States Court of Appeals for the Federal Circuit has clarified, however, that when a contract award is challenged based on regulatory or procedural violation, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or

regulations." *Axiom Res. Mgmt.* v. *United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (internal quotation marks omitted).

Second, if an award decision is challenged as lacking a rational basis, the trial court "must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors." *Savantage Fin. Servs.* v. *United States*, 595 F.3d 1282, 1287 (Fed. Cir. 2010) (internal alterations and quotation marks omitted); *see also Centech Grp., Inc.* v. *United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (holding that the trial court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." (internal quotation marks omitted)).

Third, when a disappointed bidder challenges a federal agency for acting in an arbitrary or capricious manner, the court may set aside the procurement, but "only in extremely limited circumstances." *United States* v. *John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983). This rule recognizes a zone of acceptable results in each particular case and requires that the final decision evidence that the agency "considered the relevant factors" and is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co.* v. *Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also Weeks Marine*, 575 F.3d at 1368-69 ("We have stated that procurement decisions invoke highly deferential rational basis review. Under that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors." (internal quotation marks and citations omitted)).

In addition, on a motion for judgment on the administrative record, the court is required to determine whether the plaintiff has met its burden of proof to show that the relevant federal agency decision was without a rational basis or not in accordance with the law. *Weeks Marine*, 575 F.3d at 1348 (instructing the trial court to make "factual findings [under RCFC 52.1][13] from the [limited] record evidence as if it were conducting a trial on the record"); *see also Afghan Am. Army Servs. Corp.* v. *United States*, 90 Fed. Cl. 341, 355 (2009) ("In reviewing cross-motions for judgment on the administrative record, the court must determine whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." (internal quotations omitted)). The existence of a material issue of fact, however, does not prohibit the court from granting a motion for judgment on the administrative record, nor is the court required to conduct an evidentiary proceeding. *See Bannum*, 404 F.3d at 1353-54 ("RCFC [52.1] requires the [United States] Court of Federal Claims, when making a prejudice analysis in the first instance, to make factual findings from the record evidence as if it were conducting a trial on the record.").

---

[13] A motion for judgment on the administrative record, pursuant to RCFC 52.1, is akin to an expedited trial on the administrative record and has no counterpart in the Federal Rules of Civil Procedure. *See Bannum* v. *United States*, 404 F.3d 1346, 1356 (2005) ("[T]he judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record."); *see also* RCFC 52.1, Rules Committee Notes.

### D.   Whether The Contracting Officer's Decision To Reject Plaintiff's Low Bid Violated Administrative Procedure Act Standards.

### 1.   The Plaintiff's Argument.

VIP first argues that the FHWA impermissibly considered its past performance in awarding the Contract. Pl. Br. at 18-19; Pl. Resp. at 10-12. Past performance was only to be considered as part of the initial responsibility determination. AR 31. VIP initially was found to be a responsive, responsible[14] bidder (AR 561), and the only reason that the FHWA changed course was because of "political pressure" brought to bear on the VIDPW Commissioner not to award the contract to VIP. Pl. Br. at 16; Pl. Resp. at 6 (citing AR 555, 619). Therefore, the FHWA's decision to award the contract to IRC unlawfully deviated from the July 25, 2011 IFB the FAR and reflected "impermissible influence" by politicians. Pl. Br. at 18-19 (quoting *Parcel 49C Ltd. Partnership* v. *United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994)). As such, that decision was an abuse of discretion. *Id.*

Second, VIP contends that the FHWA's reliance upon FAR 14.407-3(g)(5) to reject VIP's bid, by classifying it as a "mistake," was arbitrary and capricious. Pl. Br. at 19-25; Pl. Resp. at 8-10. The FHWA's initial September 5, 2011 analysis found that VIP's bid, while low, was "in substantial agreement [with IRC's bid] that the [Engineer's Estimate] unit prices were too high, and [thus] any attempt to reject [VIP's] bid will need to be based on something else, for instance past performance." AR 538. This determination is at odds with the FHWA's ultimate conclusion that VIP's bid was so low that it contained clear mistakes. When the FHWA revisited the September 5, 2011 analysis, the September 20, 2011 "result[s]-oriented" analysis resulted in a "mechanical accounting of the difference between IRC's price, the [Engineer's Estimate], which was largely based on IRC['s] prior pricing on [another construction] contract, and VIP's price." Pl. Br. at 22-23 (discussing AR 746-51 (FHWA's Sept. 20, 2011 analysis)). But, the September 20, 2011 analysis never concluded that VIP's bid was "so far out of line" as to evidence "clear error." Pl. Br. at 23; Pl. Resp. at 6, 8. Instead, the September 20, 2011 analysis noted that, "*if* underbid," some line items could cause financial hardship that could lead to poor performance. AR 666 (FHWA internal email) (emphasis added). VIP's bid, however, only was 20.9% lower than the Engineer's Estimate and 14.6%[15] less than IRC's bid. AR 430. It has been the practice of the GAO that low bids should be rejected only when they are 66% or more below government estimates or the next-lowest bid; in contrast, 13%-63% differences have consistently been determined to be reasonable. Pl. Br. at 22, 24 (discussing GAO cases).[16] For

---

[14] Any determination that VIP was not a responsible bidder, must be made by the Small Business Administration ("SBA"), not by FHWA. *See* 48 C.F.R. § 19.601(b)-(c); *see also Stapp Towing Inc.* v. *United States*, 34 Fed. Cl. 300, 302 (1995) ("Upon determining that a small business is non-responsible, the contracting officer must notify the SBA of its determination.").

[15] Plaintiff states that VIP's bid was 11% lower than IRC's. Pl. Br. at 25. The court, however, has calculated VIP's bid actually was 14.6% lower, using the following formula: (IRC bid – VIP bid)/IRC bid.

[16] Plaintiff cites the following cases in which GAO did not find a bid to be unreasonably low despite being 13%-63% low: *Duro Paper Bag Mfg. Co.*, B-217227, 86-1 CPD ¶ 6, 1986 WL

example, the FHWA recently granted a construction contract to VIP at Christiansted Bypass, St. Croix, where VIP's bid was 17.3% below the Engineer's Estimate and IRC's was *above* the Engineer's Estimate. AR 431. In this case, VIP's low bid was supported by the fact that IRC also bid below the Engineer's Estimate, in total and with respect to a number of the same line items. AR 489-507, 538; *see also* Court Exhibit A.

Finally, VIP did not "fail or refuse to furnish evidence" in support of its bid, as required to allow rejection of a bid under FAR 14.407-3(g)(5). Pl. Br. at 21-25. VIP's September 21, 2011 letter fully explained its lower pricing. Pl. Br. at 23-24. With respect to the "Mobilization" line item, VIP explained that it had a competitive advantage, because it owned its own equipment. AR 786. With respect to the "Construction Survey and Staking" line item, VIP explained that some of its costs were included in other line items. AR 786. With respect to the "Contractor Testing" line item, VIP explained that it had a competitive advantage because it performed the work in-house, rather than hiring subcontractors. AR 786. With respect to the "Clearing and Grubbing" line item, VIP does not suggest that it provided an adequate explanation, but notes that its price was higher than IRC's. Pl. Br. at 23; *see also* AR 747 (FHWA's September 20, 2011 analysis); Court Exhibit A. With respect to the "Irrigation System" line item, VIP's bid was very low, but this one item represented less than 1% of the overall bid. Pl. Br. at 24. With respect to the remaining line items, VIP explained that they were generated by DBE subcontractors. Pl. Br. at 24 (citing AR 787).[17] In any event, the FHWA's September 20, 2011 letter did not explain what documentation should be provided, so VIP should not be penalized for failing to produce more specific documentation, if that is what the FHWA wanted. Pl. Br. at 21.

## 2. The Government's Response.

The Government responds that it reasonably rejected VIP's offer, pursuant to FAR 14.407-3(g)(5). Gov't Br. at 5-9. FAR 14.407-3(g)(5) "does not set specific thresholds for how far out of line with other bids a bid must be in order for the contracting officer to reject it . . . ."

---

60721, (Comp. Gen. Jan. 3, 1986) (13-23%); *DOD Contracts, Inc.*, B-227689, 87-2 CPD ¶ 591, 1987 WL 103328, (Comp. Gen. Dec. 15, 1987) (17-27%); *C.W.R. Constr., Inc.*, B-224301, 86-2 CPD ¶ 629, 1986 WL 64448, (Comp. Gen. Dec. 2, 1986) (39%); *K & P Inc. & Kirsch Maint. Serv., Inc.*, B-212263, 83-2 CPD ¶ 629, 1983 WL 27486, (Comp. Gen. Oct. 11, 1983) (63%); *see also Aztech Elec., Inc. & Rod's Elec., Inc.*, B-223630, 86-2 CPD ¶ 368, 1986 WL 64109, (Sept. 30, 1986) (bid of "0" for one line-item). In addition, Plaintiff cites the following cases in which GAO rejected bids that were more than 66% low: *Cromartie & Breakfield*, B-279859, 98-2 CPD ¶ 32, 1998 WL 421789 (Comp. Gen. July 27, 1998) (67%); *R.P. Richards Constr. Co.*, B-260543, 95-1 CPD ¶ 280, 1995 WL 368419 (June 21, 1995) (67%); *Foley Co.*, B-258659, 1995 WL 57950 (Comp. Gen. Feb. 8, 1995) (66%); *Tratoros Constr., Inc.*, B-254600, 94-1 CPD ¶ 1, 1994 WL 9441, (Comp. Gen. Jan. 4, 1994) (97% low on one line item); *TLC Fin. Grp.*, B-237384, 90-1 CPD ¶ 116, 1990 WL 277616 (Jan. 26, 1990) (68%).

[17] VIP never explained in the September 21, 2011 letter that the "System Installation, Traffic Signal" item was a subcontracted item. AR 787. The FHWA, however, appears to have concluded that this item involved a subcontractor. AR 751.

Gov't Br. at 6.  A decision to reject a bid under FAR 14.407-3(g)(5) "is subject to question only where it is shown to be unreasonable."  *Nova-CPF, Inc.*, B-261677, 95-2 CPD ¶ 181, 1995 WL 611921 at *2 (Comp. Gen. Oct. 18, 1995).  In this case, the FHWA reasonably determined that VIP's bid contained numerous potential mistakes, such as the Removal of Asphalt Pavement and Irrigation Systems items, each of which was over 80% lower than the Engineer's Estimate. Gov't Resp. at 7; *see also* Court Exhibit A.  In addition, VIP's September 21, 2011 letter only provided a cursory explanation of its bid, rather than including the required "documentation on how [VIP] developed [its] prices for the line items . . . ."  AR 779.  In similar situations, the GAO has determined that an agency may reject a mistaken bid, despite the bidder's confirmation.  *See Nova-CPF*, B-261677, 1995 WL 611921 at *2-3; *Cromartie & Breakfield*, B-279859, 98-2 CPD ¶ 32, 1998 WL 421789 at *2 (Comp. Gen. July 27, 1998).  The GAO cases relied on by VIP to establish that the GAO has not found low bids to be unreasonable, unless they are 66+% lower than the agency's estimate are inapposite.  *See* Gov't Br. at 9-10 (discussing cases cited at Pl. Br. at 22).  Most of the cases that VIP cites involved situations when an agency exercised its discretion to *accept* a suspiciously low bid over objections by protestors who believed the low bid should have been rejected as a mistake.  Pl. Br. at 9.

Although VIP's low bid alone provides sufficient reason for rejection, the FHWA appropriately factored VIP's past performance into its determination.  Gov't Br. at 8-9; Gov't Resp. at 4-6.  This is because, "[i]f a contractor has a track record [redacted], a low bid means it has even less of a margin for error in being financially able to perform the job."  Gov't Resp. at 4.  Moreover, the FHWA did not usurp SBA's role of rendering responsibility determinations because "[t]he rejection of a low bid as obviously erroneous is not a matter of bidder responsibility . . . .  Rejection of a bid because it is too low or below cost concerns bidder responsibility only where there is no evidence of a mistake."  *Cromartie & Breakfield*, B-279859, 1998 WL 421789 at *3.  The VIDPW Commissioner was not influenced by political pressure, but "provided relevant information about VIP, *i.e.*, specifically that the company was [redacted] that could be evidence of a mistake in bid."  Gov't Resp. at 5.  Finally, even if the CO made a responsibility determination, by rejecting VIP's bid, it would be permissible, because "not all decisions involving the ability of a small business to perform are appropriate for determination by the SBA."  Gov't. Br. at 10.

### 3.  The Court's Resolution.

As a threshold matter, FAR 14.407-1 imposes a duty on contracting officers to examine all bids for mistakes and to request verification.  *See* 48 C.F.R. § 14-407-1 ("After the opening of bids, contracting officers shall examine all bids for mistakes.  In cases of apparent mistakes and in cases where the contracting officer has reason to believe that a mistake may have been made, the contracting officer shall request from the bidder a verification of the bid, calling attention to the suspected mistake."); *see also Giesler* v. *United States*, 232 F.3d 864, 871 (Fed. Cir. 2000) (same).  The process for determining potentially mistaken bids is discussed FAR 14.407-3.

According to FAR 14.407-3(g)(2), "[i]f the [potentially mistaken] bid is verified, the contracting officer shall consider the bid as originally submitted." 48 C.F.R. § 14.407-3(g)(2). If, however,

> the bidder fails or refuses to furnish evidence in support of a suspected or alleged mistake, the contracting officer shall consider the bid as submitted unless (i) the amount of the bid is *so far out of line* with the amounts of other bids received, or with the amount estimated by the agency or determined by the contracting officer to be reasonable, or (ii) there are other indications of error *so clear*, as to reasonably justify the conclusion that acceptance of the bid would be unfair to the bidder or to other bona fide bidders.

48 C.F.R. § 14.407-3(g)(5) (emphasis added).

The GAO has determined that FAR 14.407-3(g)(5) requires that, "[w]here it is *clear* that a mistake has been made, the bid cannot be accepted, even if the bidder verifies the bid, denies the existence of a mistake, or seeks to wave an admitted mistake . . . ." *R.P. Richards Constr. Co.*, B-2605343, 1995 WL 368419 at *2 (emphasis added); *see also Cromartie & Breakfield*, B-279859, 1998 WL 421789 at *2-3 (same). Therefore, the GAO affords a CO the discretion to reject a low bid, but the rejected bid must be "far out of line" or clearly mistaken.[18] Furthermore, agencies must take good-faith measures to verify whether the bid was made in error before rejecting a low bid, given that the objective of competition in government contracts is to obtain efficient pricing.

In contracting parlance, the word "mistake" has a specialized meaning, indicating a misunderstanding of the nature of the contract or a clerical or mathematical error. *See Liebherr Crane Corp.* v. *United States*, 810 F.2d 1153, 1157 (Fed. Cir. 1987) (distinguishing between "clerical" or "arithmetical" errors and "mistakes in judgment"); *see also Aztech Electric*, B-223630, 1986 WL 64109 at *2 ("[Bid] disparity does not by itself establish that a mistake was made . . . since . . . a bidder in its business judgment may decide to . . . submit a below-cost bid."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 151, cmt. A (1981) ("A party's erroneous belief is . . . said to be a 'mistake' of that party. . . . The word 'mistake' is not used here, as it is sometimes used in common speech, to refer to an improvident act, including the making of a contract, that is the result of such an erroneous belief."). For this reason, the GAO has emphasized that a low bid should be rejected as "mistaken," only when "either: (1) an apparent ambiguity in the bid [was] created by the bidder, such as [by using] inconsistent unit[s] and extended prices, or (2) some claim or conduct by the bidder indicat[es] that a mistake has been made, followed by an attempt by the bidder to waive any claim of mistake in order to

---

[18] The United States Court of Appeals for the Federal Circuit has stated that it "examines *de novo* the [GAO's] interpretation of the controlling FAR. 'Notwithstanding this lack of deference on questions of law, [this court] accord[s] respect to the [GAO's] interpretation of regulations that are within its field of expertise: federal procurement law.'" *McClure Elec. Constructors, Inc.* v. *Dalton*, 132 F.3d 709, 710-11 (Fed. Cir. 1997) (quoting *Ingalls Shipbuilding, Inc.* v. *Dalton*, 119 F.3d 972, 975 (Fed. Cir. 1997) (some alterations in original)).

remain the low bidder." *DOD Contracts*, B-227689, 1987 WL 103328 at *2. In short, a CO must have a strong reason to believe that a bidder was, in fact, mistaken, before rejecting a bid pursuant to FAR 14.407-3(g)(5).

The GAO repeatedly has determined that a CO's decision to reject a bid as a mistake, under FAR 14.407-3(g)(5), is an act of discretion and therefore must be reviewed to determine whether the decision was an abuse of agency discretion. *See, e.g.*, *Pamfilis Painting, Inc.*, B-237968, 90-1 CPD ¶ 355, 1990 WL 277856 at *2 (Comp. Gen. Apr. 3, 1990) ("A contracting officer's decision to reject an apparently mistaken bid under the authority of [FAR 14.407-3(g)(5)[19]] is subject to question only where it is shown to be unreasonable."); *Orbas & Assoc.* v. *Sec'y of Navy*, 863 F. Supp. 1186, 1190 (E.D. Cal. 1994) (same (quoting *Pamfills Painting*)); *see also* Ralph C. Nash & John Cibinic, *Dealing with "Significantly" Low Bids: When It's Too Good To Be True*, 8 NASH & CIBINIC REP. No. 4 ¶ 23 (suggesting that COs use their discretion to reject low bids, pursuant to FAR 14.407-3(g)(5)). Although the GAO's position has not been squarely addressed by our appellate court, the decisions of the United States Court of Federal Claims also suggest that any determination to reject a bid under FAR 14.407-3(g)(5) is discretionary. *See Manson Const. Co.* v. *U.S.*, 64 Fed. Cl. 746, 750 (2005) (recognizing that the court should not "infringe upon the agency's ability to exercise its discretion in the determination of price reasonableness [under] . . . [FAR] 14.407-3" (quoting *Atkinson Dredging Co.*, B-250965, 93-2 CPD ¶ 31, 1993 WL 274310 (Comp. Gen. July 19, 1993)).

In this case, the Administrative Record evidences that the FHWA's determination that VIP's bid contained a mistake was arbitrary or capricious. As of September 19, 2011, the FHWA made the following determinations:

(1) It did "not believe that there is any misunderstanding on the part of the Contractors [about the scope or requirements of the twelve line items analyzed]." AR 540-43.

(2) An analysis of IRC's and VIP's bids "found nothing that would raise a concern. Typically, other unit prices bid which were not consistent with [the Engineer's Estimate's] unit prices were tightly grouped, providing validation of the bids." AR 561.

(3) While VIP's poor past performance "does raise some concerns there is not enough poor [past performance] to outweigh the good [past performance] received. . . . Based on the available information, and in accordance with FAR 9.104-1, [VIP] is considered responsible and qualified to perform the contract." AR 561.

---

[19] In 1995, FAR 14.406-3(g)(5) was re-designated as FAR 14.407-3(g)(5), with no changes to the prior text. *See* Federal Acquisition Regulation; Electronic Contracting, 60 FED. REG. 34735, 34738 (proposed July 3, 1995). Accordingly, pre-1995 authorities refer to 14.406-3(g)(5).

(4) "[T]here is *no indication* that [VIP's] bid contains any mistakes."  AR 562 (emphasis added).

The Administrative Record also demonstrates that VIP had recently been awarded a contract in which it bid nearly as low as it did here, and much lower than IRC, providing FHWA with additional evidence that VIP may be capable of offering lower prices than IRC.  AR 431 (noting that VIP bid 17% lower than FHWA's Engineer's Estimate for the Christiansted Bypass Project in St. Croix, whereas IRC bid 12% *higher* than the Engineer's Estimate).

In addition, the Administrative Record does not evidence why the FHWA began to question whether VIP made a mistake.  The only written account is of a September 20, 2011 meeting, where the agency was planning to reverse its decision, because "the VI Governor want[ed] assurance that [VIP] would complete the work."  AR 645.  The idea that VIP's bid was rejected as a mistake, pursuant to FAR 14.407-3(g)(5), and that conclusion was not supported by any written analysis from agency engineers, accountants, or the Contracting Officer, but from agency counsel who suggested it as "a way [FHWA] could award to other offer [sic] *besides using responsibility/performance*" (AR 645 (emphasis added)), *ipso facto* was not rational.  *See Savantage Fin. Servs.*, 595 F.3d at 1286-87 (requiring the agency to provide a coherent and reasonable explanation of its exercise of discretion).  Moreover, nothing in the Administrative Record evidences that any agency official qualified to opine on VIP's pricing changed his mind at the September 20, 2011 meeting or discussed any particular mistakes that VIP might have made that directly justified the agency's ultimate decision.

Nor did the FHWA's subsequent September 20, 2011 and September 22, 2011 analyses fill in this gap.  It is true that the FHWA concluded that "the information submitted [in VIP's September 21, 2011 letter] only marginally supports [VIP's] prices and no documentation to further substantiate support [sic] those prices has been submitted to help understand the reasoning for the low prices" and that "[w]e remain extremely concerned over prices submitted for contract pay items that will be constructed by [VIP]'s DBE Contractor."  AR 667, 703.  But the Administrative Record contains no written analysis explaining why the more sanguine September 5, 2011 analysis was incorrect.  *See Savantage Fin. Servs.*, 595 F.3d at 1286-87.  Indeed, the later agency "analyses" do not even acknowledge the agency's prior conclusions.  AR 667 (Sept. 22, 2011 analysis of VIP's letter); AR 702-04 (Sept. 22, 2011 Memorandum recommending the award to IRC); AR 734-39 (FHWA's Sept. 20, 2011 analysis).  More importantly, the Administrative Record contains no determination that VIP made a technical or mathematical mistake with respect to any particular line item, nor that it misunderstood the requirements of any particular line item.  To the extent there were mistakes in the bid process, the Administrative Record suggests those mistakes were made by the FHWA, not VIP.  As the FHWA's Planning & Programs Manger concluded: "If the contractors computed quantities the same way I did, their unit prices could be skewed all over the place to try and make it more beneficial to them."  AR 733.

Because the IFB also appears to have contained mistakes that "skewed" the unit price bids, the FHWA's October 13, 2011 agency-level bid protest decision rejected VIP's bid for being "*overall* unreasonably low."  AR 760 (emphasis added); *see also* AR 771.  The FHWA, however, failed to identify any particular VIP mistakes that were believed to have contributed to

the low bid.  AR 760, 771.  Nor did the FHWA provide documentation or analysis suggesting that a bid 20% below the Engineer's Estimate, and 14.6% below the competition, evidences a mistake.

The GAO cases that the Government cites involve either errors so large that there could be little doubt of an error or admissions of error by the contractor.  *See, e.g.*, *Cromartie & Breakfield*, B-279859, 1998 WL 421789 at * 3 (noting that the protestor's bid was 67% lower than the next-lowest bidder and the evidence showed that the low bidder had not acknowledged tasks that constituted half of the solicited work); *Nova-CPF*, B-261677, 1995 WL 611921 at *3 (noting that post-bid discussions established that the protestor "disagree[d] with the agency as to [the requirements of the contract]"); *Atlantic Servs.*, B-245763, 1992 WL 22954 at *3 (upholding agency decision to reject a mistaken bid, after the contractor admitted that its bid contained mistakes).  Although the United States Court of Appeals for the Federal Circuit has never addressed the question of how low a bid must be to justify rejection, it has suggested that the difference between the suspected low bid and the next-lowest bid should be substantial.  In rejecting the contractor's claim for rescission based on a mistake in *Giesler*, our appellate court noted that the bid in question was "only about 10% lower than the next-lowest bid" and described the higher bid as "only slightly higher."  *Giesler*, 232 F.3d at 873; *cf. also McClure*, 132 F.3d at 712 (noting that a CO, after seeking confirmation but requesting no further documentation, "had no way of knowing [that the contractor] had made an error on its worksheets," despite a bid 40% below the Government estimate and 20% below the next-lowest bidder).  In this case, however, the FHWA concluded that a 14.6% overall difference was "unreasonably low," despite confirmation by the bidder and with no explanation of why the agency's original September 5, 2011 analysis was in error.  AR 760.

The Government further argues *post hoc* that the FHWA reasonably concluded that VIP's bid contained mistakes based on *VIP's poor past performance*.  But the Government points to no document in the Administrative Record where the FHWA's decision-makers explain their concerns in these terms.  Instead, the Administrative Record suggests that the FHWA rejected VIP's bid, citing FAR 14.407-3(g)(5), to obscure other reasons.  Specifically, *prior* to receiving VIP's September 21, 2011 letter, the CO suggested that the decision to award the contract to IRC was a *fait accompli*: "[I]f [VIP] still verifies I will need something from [the Highway Design division] stating that based on actual (Island Roads' actual to show the costs for some of the critical items. [sic]  Don't know if it will work, but we are working on it."  AR 645.  Combined with the fact that the FHWA afforded VIP less than two days to respond to its September 20, 2011 letter, the Administrative Record suggests that the FHWA was not trying to assess whether VIP made a mistake, but to find a way to reject its bid.

In addition, nothing in the Administrative Record explains why the FHWA suddenly reversed its original position that there was "not enough poor [past performance] to outweigh the good [past performance that VIP] received."  AR 561.  The only information in the Administrative Record that could have swayed the FHWA on September 20, 2011 was the more comprehensive performance evaluations received by the agency on September 19, 2011.  But, VIP's prior [redacted] performance ratings already were known, and nothing in the Administrative Record explains how any of the new information changed the agency's prior analysis.

It is possible that the FHWA was worried not about VIP's bid, but about its ability to perform.  If so, the appropriate response was for the FHWA to make an adverse responsibility referral to the SBA.  *See* FAR 19.601(c) (requiring that "[a] contracting officer shall, upon determining an apparent successful small business offeror to be nonresponsible, refer that small business to the SBA for a possible [Certificate of Competency], even if the next acceptable offer is also from a small business"); FAR 9.104-3(d)(1) ("Upon making a determination of nonresponsibility with regard to a small business concern, the contracting officer shall refer the matter to the Small Business Administration, which will decide whether to issue a Certificate of Competency . . . .");[20] *see also Neal R. Gross & Co.*, B-217508, 85-1 CPD ¶ 382, 1985 WL 52593 at *2 (Comp. Gen. Apr. 2, 1985) ("[W]e have held that the question of whether a bidder will be able to perform the contract in light of a low bid price is a matter of responsibility.").[21] The FHWA's decision not to proceed in this manner, if its general concern was about VIP's ability to perform, was also was arbitrary, capricious, and contrary to law.

## IV.    CONCLUSION.

The court has determined, based upon the Administrative Record, that the FHWA's decision to withdraw the initial intended contract award to Plaintiff violates FAR 14.407-3(g)(5) and otherwise was arbitrary, capricious, and an abuse of discretion.

---

[20] The Government's reliance upon *Centech Grp., Inc.* v. *United States*, 554 F.3d 1029 (Fed. Cir. 2009), for the proposition that a responsibility determination need not be referred to the SBA is misplaced.  *See* Gov't Br. at 10.  In *Centech*, the United States Court of Appeals for the Federal Circuit held that it was not a responsibility determination for a CO to determine from the bid that a small business *refused* to comply with the requirements of the contract, as opposed to determining that the small business *was not capable* of performing properly, which is a responsibility determination.  554 F.3d at 1040.  Nothing in *Centech* supports the proposition that an agency may undermine the SBA's authority by making a back-door responsibility determination via FAR 14.407-3(g)(5).

[21] Finally, FHWA's October 13, 2011 Protest Denial also purported to reject VIP's bid pursuant to FAR 52.214-19(b).  *See* AR 770-71 (citing 48 C.F.R. § 52.214-19(b) ("The Government may reject any or all bids, and waive informalities or minor irregularities in bids received.")).  The Government, however, has not raised this argument, and it is deemed abandoned.

Accordingly, Plaintiff's November 21, 2011 Motion For Judgment On The Administrative Record is granted and the award to IRC is permanently enjoined. The Government's November 21, 2011 Motion For Judgment On The Administrative Record is denied. FHWA is instructed to take appropriate measures, which may include re-competing the Contract. *See* AR 733 (internal FHWA email suggesting that the Contract be re-competed because of agency errors in the IFB).

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**